[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
SUPPLEMENTAL MEMORANDUM OF DECISION
This is an action for dissolution brought by the plaintiff wife against the defendant husband in February of 1992. The parties were married on February 16, 1986 in Stamford, Connecticut. Following the institution of the action, the defendant was forced to leave the house and he presently resides in Stamford. The marital home at that time was in Stamford, and the plaintiff continued to remain in it until September of 1993 at which time the house was foreclosed.
There are two minor children issue of the marriage, Daniel born on September 15, 1986 and Illana on April 26, 1990. There is also an older son born to the defendant in one of his prior marriages who lives in Canada with his mother. He is said to be of college age but there was CT Page 8321 no evidence as to his exact age.
The parties presently live at a distance from each other. The plaintiff moved to the Washington, D.C. area in September of 1993, following the foreclosure of the marital house. The law day was in September and she seems to have been under the impression that that meant she had to move although she had been planning to move some time before that. The defendant still resides, as indicated above, in Stamford.
The plaintiff, who was born in Russia, has the equivalent of a Bachelor of Arts degree and an extra year at college according to the health certificate. She is a computer programmer and presently works in that capacity with the United States government under a contract which expires July 1, 1995. The defendant, who was also born in Russia, has lived in Israel, England, Canada and the United States. Both parties are citizens of the United States.
The defendant is an engineer by training; however, it is not clear what degree, if any, he has. The health certificate indicates he has had five years of college work. He is self-employed operating a business which involves attracting American companies to do business in Russia. To do that, he contacts the companies, persuades them to let him do a marketing study, and on the basis of the marketing study, has them determine if they wish to go further in selling their products to companies in Russia. If they decide to do that, he arranges transportation to Russia, an apartment with a maid, a car, a chauffeur and groceries for a week and provides contacts with organizations or companies or government agencies who he has previously contacted and alerted to the possibility of doing business with the American companies. He has opened bank accounts in four or five different names to perform some of the functions required by his business. His explanation of their functions is somewhat difficult to follow and those functions will be treated separately under the question of finances.
There appears to be no agreement on anything except possibly physical custody of the children. The defendant appears to have agreed that, because of his own travel schedule, it would be impossible for him to have physical custody of the two children. He has asked for joint custody. The plaintiff, however, has asked for sole custody and there has been no attempt at conciliation although there was an attempt at mediation which was unsuccessful.
All of the other issues; to wit, legal custody, visitation, child support and alimony and disposition of marital assets are all in CT Page 8322 dispute.
CAUSE OF BREAKDOWN
This appears to have been a stormy marriage from the outset. When the parties were married, the plaintiff was already pregnant with Daniel. However, that pregnancy was opposed by the defendant who wished her to have an abortion. She refused and thereafter they were married. However, at the time of the child's birth, the defendant had taken off for Pennsylvania in search of some business connection. He returned the night the child was born and took the plaintiff to the hospital but then left her there and returned home. Ten days after the birth of the child he went to Moscow on a trip and then took a couple of weeks for vacation before he returned home. On his return, he scolded his wife for not taking better care of his business while he was away. He appears to have had little or no care of Daniel at this time.
When the plaintiff became pregnant the second time, the defendant again urged an abortion, and this time the plaintiff consented. When she was pregnant the third time, however, she refused to have an abortion, which he again urged, and the child Illana was born. The defendant then suggested that a Russian woman he met in Moscow should come and live with them as a nanny. Despite the plaintiff's objections, the defendant arranged for her to come and live with them. This appears to have been the last straw, particularly after the plaintiff objected strenuously and the defendant then removed the young woman to his office to live. He thereafter obtained an apartment for her. While the plaintiff had opposed this as a temporary measure, the plaintiff discovered that the woman in question had applied for asylum and was seeking to live in this country permanently. It was also apparent to the plaintiff that the defendant was having an affair with this woman. Consequently, plaintiff brought this action for divorce.
It does appear on the face of it that the defendant was the primary cause of the breakdown of the marriage, their mutual incompatibility notwithstanding, and the court so finds.
CUSTODY
The defendant admits that he would not be able to take care of the children because his travel schedule, two to three and sometimes four trips to Moscow a year plus vacations in Florida and elsewhere, would make it difficult for him to provide any continuous care for the children. Consequently, physical custody would have to be with the mother. The issue, then, is whether legal custody should be joint or CT Page 8323 sole. The Family Relations officers, both Mr. McGoldrick and Ms. Lacey, report and the court also became aware in the course of the proceedings that these parties cannot even talk to each other. It is impossible for them to discuss their children without an argument, and an order of joint custody would, therefore, be totally inappropriate and, in fact, contrary to law. See Emerick v. Emerick, 5 Conn. App. 649 (1985). Consequently, the court will not order joint custody. The plaintiff has been the primary caretaker of the children since their birth and is caring for them now in Virginia and her ability to give them proper care has not been questioned. Plaintiff shall have sole custody of the two minor children subject to the defendant's rights of visitation as hereinafter set forth.
Given the defendant's travel schedule, visitation shall be as liberal as possible and as hereinafter set forth.
FINANCES
The problem of alimony, child support and the disposition of any marital property depends on an analysis of the parties' finances. The plaintiff's finances are relatively easy to determine since she is working at a job in which she has a stated salary and will have until July 1, 1995. The defendant, on the other hand, has failed to provide the court with any financial affidavit after June, 1994, and the records he has provided in prior affidavits, bank accounts and tax returns constitute a veritable labyrinth and what the facts are requires a good deal of analysis.
It does appear that the defendant has under estimated or under reported his income, not only in his affidavits but in his income taxes. His bank accounts almost uniformly record deposits of far more than he includes as income in his affidavits.
Thus, in 1991, his income tax return reported his gross income at $40,361. (See exhibit W.) His bank deposits for the same period totalled $107,000, that is, in his 1991 U.S./U.S.S.R. account. (See transcript for February 24, 1994, page 6.) In 1992, he reported gross income of $71,110. For the same year, his total deposits in his U.S./U.S.S.R. bank accounts amounted to $141,000. (See transcript of February 24, 1994, pages 20-22.) In addition, his Elinkon account had approximately $12,456 in deposits for 1992 and the Santech Corporation account had deposits totalling $54,783. The total, therefore, of all deposits in the three accounts was $208,900 for 1992. (See exhibits T, X and K.) In 1993, his tax return reports $57,990 as his income while his bank deposits totalled $94,329.19. (See exhibits JJ, II, and HH.) CT Page 8324
While he lists expenses in 1992 of $30,790, the only document he used to support that figure was a typewritten list he apparently gave to H R Block to prepare his tax return. The expenses he claims to have had he supported by a corporate American Express card which totalled $13,449 of which $8,377.71 were retail charges, that is, personal expenses. (Exhibit Z.)
Not only was there no backup for his expenses, but the difference between the same expenses for 1993 and 1992 was $10,000. Moreover, he testified that he charges $7500 for each client, and of that amount, he gets only ten percent and his partner in Moscow gets fifty percent. The remaining forty percent he claimed went for expenses for the air fare and visas. However, he also testified that the cost of the air fare is $1,500 and the visa is $150 for each client for a total of $1,650. There is, thus, a balance left from that income of $1,350, not $750. He also said he charged $350 to $450 a day for the time spent in Russia, usually about a week, and for the services provided there he paid $70 a day, making a profit of somewhere between $300 and $400 a day or about $2800 a week.
The defendant also testified he received monthly fees from two or three clients for eighteen months in the amount of $1,500 to $3,000. If the amount was $3,000, he received $36,000 a year, and if all three paid that, he would have received $108,000 a year.
On this basis, there appears to be no backup for the expenses that he claims. Further, if one adds his bank deposits for his last reported years, 1991, 1992 and 1993, the total is $410,229. Dividing that by three gives a figure of $136,743. This would appear to be much closer to what he is actually earning than any of his reported amounts on his tax returns and/or his affidavits. He has chosen not to file an affidavit for 1994, although his counsel was informed that there was none in the file prior to the writing of this opinion.
The court must, therefore, base its determination of the defendant's earning capacity on the years for which there are records, 1991, 1992 and 1993. On that basis, the court finds a gross income of $136,743. Assuming expenses of $30,000, to give him the benefit of any doubt, would leave a net income of approximately $106,243 a year. His actual earning capacity is probably greater because he seems to have his own definition of income. For example, he asked U.S. Surgical to change their 1099 form reporting their payments to him not to reflect the total amount of payments but only ten percent thereof. He said the balance should be considered travel expenses for their executives. (See CT Page 8325 exhibit LL.) If he is only reporting ten percent of what he receives, his income is far in excess of what the court finds to be his earning capacity. However taking all the evidence into consideration, the court finds his earning capacity to net $106,000 a year or $2,038.46 a week.
On the basis of the court's finding of the defendant's earning capacity, the total net income of both parties is $2573.46. Of that, the defendant's income of $2,038.46 per week is 79.2 percent. The plaintiff's income is more than the amount set forth in the guidelines because her affidavit reflected $170 for the Au Pair, not $300. The support guidelines speak only to income up to $1750 per week and for that amount the support recommended is $480 a week for two children.
The amount projected by the guidelines is a minimal amount. If applied without modification to this matter, it is the court's opinion that the children would be shortchanged. Both of them have special needs, the boy being hyperactive and the girl having a language problem. Both of them attended private schools when the parties were living together, and one of them still attends a private school. There is some indication that the child not attending the private school, Illana, probably should be because of her language difficulty. Moreover, the plaintiff is now a single parent with a full time job and must provide child care for her children. This is an added expense which could well reduce the amount available for the children's other needs substantially.
The court, therefore, finds that the minimum order is not sufficient for these children. It would require the defendant to pay $384 a week. The court finds that he should be required to pay $400 a week minimum so as to be sure that the children's needs are met.
One of the areas of dispute has been the responsibility for the foreclosure of the marital home. The defendant was ordered by Judge Coppeto, in August of 1992, to pay the then overdue payments for two months (July and August). While he never made the payments, his claim seems to have been, although it is not clear that it was, that he could not afford it. However, if one looks at the 1992 bank accounts at Union Trust in the name of U.S.-U.S.S.R. Marketing, Santech and Elinkon-U.S.A., it would appear that he had sufficient funds from which to make the payments. His balances in each of these accounts from July to the end of the year are as follows: CT Page 8326
MONTH U.S.A.-U.S.S.R. MARKETING SANTECH ELINKON TOTAL
July $8,284 $13,300 $21,504 August $3,080.86 $ 7,292.33 $10,323.19 September $ 760 $ 9,085 $1,864.36 $11,025.35 October $9,872 $ 9,702 $19,574 November $2,669 $19,869.56 $22,538.56 December $2,781 $22,119.50 $2,953 $27,853.36
In addition, he had access to $10,000 in a joint account with his father. (See exhibit LL.) He also claimed deductions for the support of his son and alimony for one of his former spouses in his 1992 financial affidavit. (Exhibit EE) The total of the support and alimony claimed was $1,150 a month or $13,800 a year. He also claimed deductions for taxes of $1187.50 per month or $14,250 a year. In fact, his tax for 1992 was only $2,000. The payments he was deducting for alimony and support were never paid by him. They were paid by his parents. He said he gave them money from time to time but there were no documents to back that up, no checks, no receipts and no court orders.
Moreover, in the defendant's November affidavit he also stated that he had checking accounts for U.S.-U.S.S.R. and Santech in the total amount of $14,000. This in spite of the fact that his total monthly expenses were alleged to be $7,738.87 with a net income of $3,562.50. (See exhibit EE.)
The court, therefore, finds that he had ample resources with which to comply with the court order that he pay the July and August mortgage payments.
Both parties are asking that the other party be held responsible for the failure to save the marital home from foreclosure. It appears to the court that both are responsible but perhaps not to the same degree. The defendant certainly failed to obey the court order that he pay the two mortgage payments that were due and there appears to be no basis for his claiming inability to pay them. The plaintiff on the other hand was earning around $90,000 a year in 1992 and continued to do that until at least April of 1993. However, at that time her position was either terminated or she was notified it would be terminated. That fact would excuse her from making any payments in 1993 after April. She however failed to make any payments in 1993 or 1992. Again, she may be excused from having made any in July and August, 1992 since the defendant had been ordered to make at least the July and August payments but to fail to make any payments at all when she appeared to be in a position to do so means that she did not make any attempt to mitigate the damages which she now claims.
On the basis of the plaintiff's failure to make any attempt to pay CT Page 8327 the payments between September, 1992 and April, 1993, and the defendant's failure to make any payments between the end of June of 1992 and the end of August, 1993, the court finds the defendant to be fifty-four (54%) percent responsible for the foreclosure of the marital home and the plaintiff forty-six (46%); percent responsible for it.
Since there is still outstanding a balance on the home equity loan of $24,638, for which both parties are liable, the degree of their responsibility for the foreclosure would be an appropriate measure of their share in the liability for this debt. Consequently, the court finds the plaintiff is forty-six percent responsible for the paying of the home equity loan and the defendant is fifty-four percent responsible.
The court hereby issues the following findings and orders.
1. The parties were married in Stamford on February 16, 1985 and both have lived in this state for more than one year prior to the filing of this action.
2. Neither party has received or is receiving state, federal or municipal aid.
3. There are two children of the marriage, Daniel born September 15, 1986 and Illana born April 26, 1990.
4. The court finds that it has jurisdiction and that the marriage has broken down irretrievably with no hope of reconciliation, the defendant being the primary cause of the breakdown, and it is hereby dissolved.
5. ALIMONY:
 The defendant shall pay the plaintiff the sum of $350 a week as alimony for a period of seven years from the date of the entry of this judgment.
6. CUSTODY:
 a. Custody of the two children, both physical and legal, is awarded to the plaintiff with visitation as hereinafter set forth.
 b. In the event of the death or permanent disability of either party, the surviving parent shall assume the entire custody of CT Page 8328 the children and shall be sole guardian of the children's person and property. Neither party shall make any provisions by Will inconsistent with this paragraph.
 c. The parties shall notify the other by registered or certified mail, return receipt required, of any change of address and/or telephone number, within five days of the date of such change. In the event that the plaintiff shall decide to move away from the Springfield, Virginia and Washington, D.C. area, she must first give not less than ninety (90) days written notice to the defendant of her intention.
7. SUPPORT:
 The defendant shall pay to the plaintiff by way of support the sum of $400 per week for the support of the two children beginning July 1, 1995. When the oldest child reaches the age of majority, the support shall be reduced to $300 a week until the youngest child has reached the age of majority.
8. SURETY BOND:
 The defendant shall file a bond in the amount of $10,000 as surty [surety] for the payment of child support and alimony for one year.
9. VISITATION:
 In addition to the interim order of visitation dated January 20, 1995 and appended here to as apart hereof, the defendant shall have visitation as follows:
 a. The second weekend of each month beginning at 6:00 p. m. on Friday and ending at 6:00 p. m. on the following Sunday unless the Monday following the weekend is a school holiday. In that case, visitation shall end at 6:00 p. m. on Monday.
 b. The Passover holiday from the first day thereof until the following Sunday at 6:00 p. m. This shall be in addition to his regular weekend visitation.
 c. Five weeks in July or August at the defendant's option, but he must notify the plaintiff by registered mail by May 1st of the year in which the visitation is to made as to which month he will be taking as his visitation. CT Page 8329
 To provide for five weeks for the defendant during the summer, some of the time must be spent in more than one month. The court will order the following periods for the summer vacation for the years of 1996 through 1999 as follows:
 1. In 1996 the summer vacation shall provide the defendant with 35 days of visitation in one of two equal segments between June 23rd, 1996 through September 1st, 1996, with the first segment beginning June 23rd and ending on July 27th and the second segment beginning July 28, 1996 and ending September 1st, 1996 at 6:00 p. m., subject to his notifying the plaintiff by May 1st of that year whether he will take the first or second segment.
 2. In 1997, the July segment shall begin on June 27th and run to August 1st and the August segment will begin on August 1st and run to September 4th.
 3. The same division shall obtain for 1998 and 1999 with the time for the beginning and the end of each vacation period as set forth above. All of the summer vacations are conditioned on the defendant's notifying the plaintiff by May 1st of each year whether he wishes to take the vacation in July or in August.
 d. In 1995 and on alternate years thereafter, the defendant shall have visitation on Thanksgiving for the Thanksgiving holiday from the Wednesday before Thanksgiving at 6:00 p. m. to Sunday after Thanksgiving at 6:00 p. m. This shall be in addition to his regular weekend visitation.
 e. In 1995 the Christmas holiday and the winter break shall be shared by the parties with the defendant picking up the children on the 22nd of December at 10:00 a.m. and returning them on the 27th at 6:00 p. m. Thereafter, in 1996, the defendant shall have the children for the entire period of the winter break beginning on December 23rd until two days before school opens at 6:00, p. m. and thereafter he will have that Christmas vacation every other year, that is, 1998, 2000, etc.
 f. In the years in which he does not have visitation over the Christmas vacation he shall have the spring vacation beginning the day after the school closes at 10:00 a.m. and ending two days before school opens at 6:00 p. m. CT Page 8330
 g. All visitation of three days or less must be held in the Washington, D.C. area. Any visitation of over three days may be outside of that area in Florida with the defendant's parents or in Canada with them or in New York with the defendant. Should the defendant wish to take the children elsewhere, he must notify the plaintiff at least two weeks before the visitation begins.
 h. The defendant shall be responsible for all transportation costs during visitation. The plaintiff shall be responsible for taking the children to the airport or train station or bus station where the visitation requires such travel or to the hotel in the Washington area when the defendant is exercising his visitation there. She is also responsible for picking them up at the same airport or the train or bus stations or the hotel when the visitation ends. However, the times for those pickups and deliveries must be such as to prevent the plaintiff from having to leave work.
 i. If the children travel by plane or train or bus, they must be accompanied by an adult chosen by the defendant and approved by the plaintiff. Until the children are ages ten and eight respectively, the adult may not be airline or bus or railroad personnel. When they are ten and eight respectively, the responsible adult may be an airline or train steward or stewardess or a bus attendant who will take responsibility for them during the trip, but the trip should not be longer than one hour.
 They should not travel alone or in the care of airline personnel for more than one hour until Daniel is at least 12 years of age and Illana is ten years old in his company. In any case, they should be taken to the plane, train or bus station and boarded by the plaintiff or the responsible adult excluding airline, train or bus personnel and they should be met at their destination by the defendant or the responsible adult chosen by him as set forth above as they disembark. Plaintiff shall, of course, meet them when they disembark on their return.
 j. For purposes of the visitation schedule, the holidays which may be included in the defendant's weekend visitation are as follows: Martin Luther King Day, President's Day, the first day of Passover, Memorial Day, Columbus Day and Veterans Day. Labor Day is not included since it comes within the summer CT Page 8331 vacation schedule.
 k. While the children are visiting with the defendant during the summer, he shall provide a minimum of three weeks vacation summer day camp for them.
 1. For all these visitations, the defendant must notify the plaintiff of his intention to exercise these rights at least three weeks prior to the visitation by certified mail. He shall also provide transportation information three weeks before by certified mail.
 m. In addition to the holidays enumerated above, any school holiday which falls on a Monday or a Friday maybe included as part of the defendant's weekend visitation. Should this not be on the second weekend of the month, he may take the weekend including that holiday as an alternative provided he notifies the plaintiff three weeks ahead of time by certified mail. The plaintiff must notify the defendant by certified mail as soon as she receives the schedule of school holidays or any notice of any school holiday.
 n. During all of the visits with the defendant father, the plaintiff may speak to the children by telephone once a day and for that purpose the defendant must provide her with the address where the visitation is taking place and the telephone number where they are staying.
 The defendant shall also have the right to speak to the children by telephone at their home once a day at 6:00 p. m. If the children are in the care of a nanny or other caretaker, other than the plaintiff, the caretaker must be instructed by the plaintiff to speak with the defendant.
 o. Each party shall exert every reasonable effort to maintain free access and unhampered contact between the children and the other parent. Neither parent shall do anything which may estrange the children from the other parent or injure the opinion of the children as to the other parent or which may hamper the free and natural development of the children's love and respect for the other parent.
 p. Each party shall advise the other if either of them knows of any illness or accident or other circumstance seriously affecting the health or welfare of the children, he or she, as CT Page 8332 the case may be, will promptly notify the other, and both parties shall have reasonably unlimited access to the children, consistent with the circumstances, for so long as the situation occurs.
 q. The parties shall confer and seek agreement with each other on all important matters pertaining to the children's health, education and welfare. However, the day-to-day routine decisions affecting the children's affairs, including routine medical and routine educational decisions, shall be made by the plaintiff and she shall use her best efforts to discuss the aforesaid decisions on a timely basis with the defendant.
 r. The defendant's failure or inability to exercise any right of visitation, contact and access with the children on any particular occasion shall not be construed to be, nor constitute, a waiver of his right to exercise all of his future rights of visitation or full compliance with the provisions hereof at any later time.
 s. In the event of the illness of either of the children at any time, where a medical doctor has determined that the sick child cannot travel, the defendant may, nonetheless, exercise his right of visitation with the sick child at a hotel or a reasonable site in the Washington D.C. area. If the child is confined to bed rest in the home, then the defendant shall have the right of visitation with the sick child at the place where he or she is confined for up to three (3) hours upon reasonable notice to the plaintiff. If either of the children becomes ill during vacation with the defendant, it will be the defendant's responsibility to take them to the doctor and to provide the necessary care, providing the plaintiff shall remain responsible for all resulting insurance claims and payments. If the same occurs during the weekend visitation in Washington, D.C., the defendant shall contact the plaintiff and will either return the child home or care for the child depending upon the nature of the illness.
 t. The plaintiff shall provide the defendant with a list of health care providers and necessary information or cards for the children's health plan, including proof of coverage outside of the Washington, D.C. area, within the United States and Canada. If the plaintiff's current health plan does not so provide, then the plaintiff shall immediately make plans to provide such coverage for the children. CT Page 8333
 u. Neither party shall take the children outside of the United States of America without the consent of the other, which consent, however, shall not be unreasonably withheld. Once a year, the defendant as part of his visitation may take the children to visit their grandparents and stepbrother in Montreal, Canada. However, he shall provide advance notice of the dates of said visitation.
 v. The plaintiff shall provide a copy of the children's medical insurance card and remit to the defendant all insurance reimbursements if the underlying bill was paid in full by the defendant and there is a receipt for payment. During all of the visits with the defendant, the defendant shall be responsible for the children's obtaining any necessary medical care for any illness, which means a fever of 101 degrees or more or a constant medical condition for more than three days or physical injury.
 w. The father shall not sleep with the children in the same bed and shall not sleep with a female companion in the same room as the children.
 x. The plaintiff will provide the father with a list of regular weekend activities for the children such as parties, sporting events and classes. The defendant in consultation with the children shall determine which, if any, of those activities to attend with the children or that the children will attend during visitation.
 y. The plaintiff shall provide the name of the children's pediatrician to the defendant and the names and addresses of their schools.
 z. The only communication between the parties shall be by mail except where time constraints require oral communication.
 aa. When the children's birthdays do not fall on the defendant's scheduled visitation, the defendant may provide a celebration during the visitation immediately preceding the birthdays or elect to exercise it on a weekend closest to the date of the birthday provided he notifies the defendant three (3) weeks in advance and provided further that this does not entitle him to an additional weekend of visitation. CT Page 8334
 bb. The plaintiff must give the defendant at least ninety days' notice by certified mail of any intention to move away from the Springfield, Virginia and Washington, D.C. area. In the event such a move would render the visitation schedule impractical, the parties may return to Family Relations or to the court to rearrange the schedule if they are unable to do so themselves.
 cc. The defendant must notify the plaintiff at least three (3) weeks before any scheduled visitation of his inability to exercise said visitation. He shall be able to make up such missed visitation during the next weekend when he is available within the same month provided he so notifies the plaintiff when he cancels his scheduled visitation.
 dd. Each party shall be entitled to full and complete and detailed information from the children's teachers, schools or colleges, and the defendant is entitled, at his request, to receive all reports and records from said teachers, schools and colleges that may be provided to the plaintiff. For this purpose, the defendant shall notify the schools in writing of his interest and request all such reports and records.
10. BANK ACCOUNTS:
Each party shall retain all bank accounts in his or her own names.
11. LIABILITIES:
 a. Except for the home equity loan as set forth below, each party shall be responsible for the debts incurred by that party individually and shall pay the debts listed on his or her respective financial affidavits and shall hold the other harmless thereon, including court costs and attorneys' fees. Further, each party shall be responsible for and hold the other harmless from liability for any debts which should have been listed on the irrespective financial affidavits but which are later discovered not to have been listed.
 b. The defendant shall hold the plaintiff harmless from any liability he incurred as a result of the joint tax returns which the parties filed prior to their separation.
 c. The home equity loan presently outstanding shall be paid fifty-six (56%) percent by the defendant and forty-four (44%) CT Page 8335 percent by the plaintiff. These percentages reflect , the degree of responsibility the court finds each party contributed towards the foreclosure of the marital home.
12. PERSONAL PROPERTY:
 All of the household furniture now in the plaintiff's home in Virginia shall be the sole property of the plaintiff. Any dispute with respect to any other items, not included as household furniture, maybe referred to family relations if the parties cannot reach an agreement.
13. LIFE INSURANCE:
 The defendant shall apply for or continue any policy of life insurance he may have naming the plaintiff as irrevocable beneficiary. The amount of insurance requested, if it is now presently below $50,000, be increased to that amount or if he does not have life insurance at this time his request for the same shall be in the amount of $50,000. He shall provide proof of such insurance unless he is refused the same because of physical or mental disability. Proof of such denial shall then be provided.
14. CHANGE OF ADDRESS:
 The parties shall notify each other by registered or certified mail, return receipt required, of any change of address and/or telephone number within five (5) days of the date of such change.
15. MEDICAL INSURANCE:
 Since the plaintiff at the present time has paid for medical insurance provided for her by her employer, the court orders the defendant to pay sixty-five (65%) percent of the cost thereof in addition to the child support order.
16. ATTORNEY'S FEES:
 a. Each party shall be responsible for his or her own attorney's fees.
 b. The defendant shall be responsible for sixty-five (65%) percent of the attorney's fees for the child's attorney and the plaintiff shall be responsible for thirty-five (35%) percent thereof. This fee should be paid within two weeks of CT Page 8336 the entry of this decision.
17. In the event that it shall be determined by a court of competent jurisdiction that either party is in violation of any of this court's orders arising out of the dissolution of marriage decree, the offending party shall pay to the other party reasonable attorneys' fees, court costs and extra income taxes, if any, incurred, and to indemnify and hold the other party harmless for any losses, damages, expenses and costs, including without limitation, attorneys' fees, resulting from or made necessary by the bringing of any suit or other proceeding to secure such payment or, enforce any such obligation, provided such suit or other proceeding results in a judgment, decree, award, or order in favor of the non-defaulting party, in the enforcement of the provisions of the dissolution of marriage decree. As a condition to any claim for such fees or costs hereunder, the party claiming such fees or costs shall give the other party written notice of any alleged breach at least fifteen (15) days prior to instituting such enforcement proceedings to give the party in default an opportunity to cure the breach. The parties waive their rights to claim such fees and costs, other than as hereinabove provided.
It is so ordered.
MARGARET C. DRISCOLL, STATE TRIAL REFEREE